## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRAILBLAZHERS RUN CO., ABEO POWDER, ELIZABETH ROCK, and FRANCES RAMIREZ,<br><br>     Plaintiffs,<br><br>v.<br><br>BOSTON ATHLETIC ASSOCIATION, CITY OF NEWTON, and JOHN F. CARMICHAEL JR., Chief of Police of the Newton Police Department, in his official capacity,<br><br>     Defendants. | Civil Action No. 24-10950-IT |

## PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS OF BOSTON ATHLETIC ASSOCIATION AND MOTION TO DISMISS OF DEFENDANTS CITY OF NEWTON AND JOHN F. CARMICHAEL JR.

## Table of Contents

I.   INTRODUCTION ...................................................................................................... 1

II.  STANDARD OF REVIEW......................................................................................... 2

III. FACTUAL BACKGROUND ...................................................................................... 3

IV.  ARGUMENT ............................................................................................................. 6

    A.  PLAINTIFFS HAVE SET FORTH SUFFICIENT ALLEGATIONS TO SUPPORT EACH
       OF THEIR FEDERAL LAW CLAIMS. ...................................................................... 6

       1.  Plaintiffs Have Sufficiently Pled A Selective Enforcement Equal Protection Claim... 6

       2.  Plaintiffs Have Alleged That The BAA Is A State Actor For The Purposes of Section
          1983........................................................................................................................ 13

       3.  Plaintiffs Have Stated A Civil Rights Conspiracy Claim. ........................................ 19

    B.  PLAINTIFFS HAVE STATED A PUBLIC ACCOMMODATIONS LAW CLAIM
       UNDER M.G.L. c. 272, §98. ...................................................................................... 22

       1.  The Boston Marathon Falls Within the Scope of the Public Accommodations Law. 22

       2.  Defendants Denied Plaintiffs the Same "Conditions and Limitations" As Others
          Similarly-Situated. .................................................................................................. 24

       3.  Plaintiffs Are Not Required to Exhaust Administrative Remedies With The
          Massachusetts Commission Against Discrimination Before Commencing Suit. ....... 25

    C.  PLAINTIFFS HAVE SUFFICIENTLY PLED A MONELL CLAIM AGAINST
       NEWTON. ................................................................................................................. 27

       1.  Under Monell, Newton is Liable for the NPD's Actions At the 2023 Marathon. ...... 27

    D.  PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.......................................... 29

       1.  Plaintiffs Have Properly Named Defendant Carmichael Because They Seek Future-
          Looking Injunctive Relief. ...................................................................................... 29

       2.  Plaintiffs Have Demonstrated A Substantial Risk That Harm Will Occur to Obtain
          Injunctive Relief...................................................................................................... 30

V.   CONCLUSION ......................................................................................................... 34

## Table of Authorities

**Cases**

*A.Y. Allee v. Medrano*, 416 U.S. 802 (1974) ................................................................ 33

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ..................................... 14, 17, 18, 19

*Alianza Americas v. DeSantis*, No. 22-CV-11550, 2024 WL 1381926 (D. Mass. Mar. 29, 2024). ........................................................................................................................ 13, 15, 17

*Anderson v. Brennan*, 219 F. Supp.3d 252 (D. Mass. 2016) ......................................... 9

*Ayala-Sepulveda v. City of San German*, 671 F.3d 24 (1st Cir. 2012) ......................... 9

*Badio v. G4S Solution, USA*, No. 19-CV-12591, 2021 WL 102656 (D. Mass. Jan. 12, 2021) ...... 9

*Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp.*, 246 F.3d 1 (1st Cir. 2001). ........................................................................................................... 7, 9

*Bernier-Aponte v. Izquierdo-Encarnacion,* 196 F. Supp. 2d 93 (D.P.R. 2002) ........................... 30

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997) .. 28

*Bordanaro v. McLeod,* 871 F.2d 1151 (1st Cir. 1989) ......................................... 28, 29

*Bostock v. Clayton County*, 590 U.S. 644 (2020)) ....................................................... 12

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ........... 13, 14

*Brooks v. Martha's Vineyard Transit Authority*, 433 F. Supp. 3d 65 (D. Mass. 2020) ......... 23, 27

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) ........................................ 14

*Bush v. Fantasia*, No. 21-CV-11794, 2022 WL 4134501 (D. Mass. Sept. 12, 2022) ................ 27

*CapoDiCasa v. Town of Ware*, No. 17- CV-30079, 2018 WL 3966303 (D. Mass. Aug. 17, 2018) ........................................................................................................ 23, 26, 27

*Carmack v. Mass. Bay Transp. Auth.*, 465 F. Supp. 2d 18 (D. Mass. 2006) ................. 16

*Charland v. Muzi Motors, Inc.*, 417 Mass. 580 (1994) ................................................. 27

*Citizens To End Animal Suffering And Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass. 1990) ........................................................................ 16

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..................................... 6

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................... 31

*Concord Rod & Gun Club, Inc. v. Mass. Comm'n Against Discrimination*, 402 Mass. 716, 720 (1988) ................................................................................................ 23

*Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142 (D. Mass. 2011) ..................... 30, 31

*Currier v. National Bd. of Med. Examiners*, 462 Mass. 1 (2012)............................... 22, 23, 24, 26

*Curtis v. Loether*, 415 U.S. 189(1974)........................................................................ 12

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648 (4th Cir. 1967) ...... 32

*DeNicola v. Potter*, No. 19-CV-11391, 2020 WL 3545487 (D. Mass. June 30, 2020)................. 9

*Dennis v. Sparks*, 449 U.S. 24 (1980)............................................................. 13, 14, 16

*Dietrich v. John Ascuaga's Nugget,* 548 F.3d 892 (9th Cir. 2008) .................................... 17

*Do Corp. v. Town of Stoughton*, No. 13-CV-11726, 2013 WL 6383035 (D. Mass. Dec. 6, 2013)
.......................................................................................................................... 27

*E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738 (1st Cir. 1996)........................................... 32

*E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013)............................................. 34

*Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1 (1st Cir. 2005)..................... 17

*Evans v. Newton*, 382 U.S. 296 (1966). ........................................................... 14, 17

*Everett v. 357 Corp.*, 453 Mass. 585 (2009) ........................................................... 27

*Ex Parte Young*, 203 U.S. 123 (1908) .................................................................. 29

*Fosu v. Univ. of Rhode Island,* 590 F. Supp. 3d 451 (D.R.I. 2022)..................................... 7

*Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263 (1st Cir. 2022) ....................................... 12

*Ginsberg v. Healy Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d. Cir. 1999)............................ 17

*Gonzales v. Police Dep't, City of San Jose, Cal.*, 901 F.2d 758 (9th Cir. 1990) ......................... 32

*Green v. Wyman-Gordon Co.*, 422 Mass. 551 (1996) ................................................. 27

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)............................................................. 20

*Griffiths v. Town of Hanover*, No. 11-CV-12115, 2012 WL 3637791 (D. Mass. Aug. 21, 2012) ...
....................................................................................................................27

*Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013)............................................... 2

*Humphrey v. Comoletti*, No. 15-CV-14170, 2017 WL 1224539 (D. Mass. Mar. 31, 2017) .. 21, 22

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995)..................24

*Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 418 Mass. 247 (1994) . .................................. 24

*Jean v. Brennan*, No. 14-CV-11969, 2016 WL 4926414 (D. Mass. Sept. 14, 2016) .................. 10

*Jesionowski v. Beck*, 937 F. Supp. 95 (D. Mass. 1996) ................................................ 21

*Jones v. Baystate Health, Inc.*, No. 22-CV-10417, 2022 WL 21778544 (D. Mass. Nov. 4, 2022)
.......................................................................................................................... 23

*Joubert-Vazquez v. Alvarez-Rubio*, 820 F. Supp. 2d 289 (D.P.R. 2011)...................................... 12

*Kaiser v. Kirchick*, 662 F. Supp. 3d 76 (D. Mass. 2023) .................................................... 25, 26, 27

*LaBonte v. Riverside Park Enterprises, Inc.*, No. 22-CV-30046, 2022 WL 17253663 (D. Mass. Nov. 28, 2022) ..................................................................................................... 26, 27, 33

*Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026 (D. Minn. 2010) ......................................... 21

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ....................................................... 13

*Local Finance Co. v. Mass. Commission Against Discrimination*, 355 Mass. 10 (1969) ...... 23, 24

*Lu v. Smith*, No. CV 15-14081, 2016 WL 4595206 (D. Mass. Sep. 2, 2016) ............................... 9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 30

*Lyman v. Baker*, 954 F.3d 351 (1st Cir. 2020) ........................................................................... 32

*Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34 (1st Cir. 2013) ..................................................... 3

*Menard v. CSX Transp., Inc.*, 698 F.3d 40 (1st Cir. 2012) ............................................................ 8

*Merriam v. Demoulas*, No. 11-CV-10577, 2013 WL 2422789 (D. Mass. June 3, 2013) ............. 33

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) .......................................................... 2, 28

*N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426 (1941) ................................................................... 32

*Obele v. Town of Brookline*, No. 20-CV-11117, 2021 WL 828412 (D. Mass. Mar. 4, 2021) ........................................................................................................................ ......6, 11

*Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1 (1st Cir. 2011) .............................................. 3

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) .................................................................. 28

*Peters v. Boston Properties, Inc.*, No. 2084-CV-02447, 2021 WL 3493907 (Mass. Super. June 15, 2021) ....................................................................................................................... 26, 27

*Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804 (1st Cir. 1971) ................................. 32

*Quarterman v. Springfield*, 716 F. Supp. 2d 67 (D. Mass. 2009) ................................................ 27

*Ramirez v. City of Worcester*, 252 F. Supp. 3d 29 (D. Mass. 2017) ............................................ 19

*Richard Roe W.M. v. Devereux Found*, 650 F. Supp. 3d 319 (E.D. Pa. 2023) ............................. 31

*Rios-Colon v. Toledo-Davila*, 641 F.3d 1 (1st Cir. 2011) ........................................................... 11

*Roe v. Healey*, 78 F.4th 11 (1st Cir. 2023) ................................................................................ 31

*Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230 (1st Cir. 2002) .................................................. 29

*Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011) ................................................................. 17

*SBT Holdings, LLC v. Town Of Westminster*, 547 F.3d 28 (1st Cir. 2008) ................................... 7

*Sec. & Exch. Comm'n v. McLellan*, ___ F.Supp. 3d ___, 2024 WL 3030421 (D. Mass. June 17, 2024) ................................................................................................................................ 34

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .............................................. 30

*Tapalian v. Tusino*, 377 F.3d 1 (1st Cir. 2004) ........................................................... 6, 7

*Thomas v. Eastman Kodak Co.,* 183 F. 3d 38 (1st Cir. 1999) ...................................... 11

*Town of Brookline v. Alston*, 487 Mass. 278 (2021) .................................................. 27

*U.S. v. Sunsetter Products LP*, No. 23-CV-10744, 2024 WL 1116062 (D. Mass. Mar. 14, 2024) ............................................................................................................................. 33

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ............................................. 12

*United States v. Miller,* 588 F.2d 1256 (9th Cir. 1978) .............................................. 34

*Valentin v. Town of Natick*, 633 F. Supp. 3d 366 (D. Mass. 2022) ............................ 12

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635 (2002) ..... 30

*Wagenmann v. Adams*, 829 F.2d 196 (1st Cir. 1987). ........................................... 18, 19

*Welch v. Ciampa*, 542 F.3d 927 (1st Cir. 2008) ........................................................ 28

*Whren v. United States*, 517 U.S. 806 (1996) ........................................................... 10

*Wright v. Town of Southbridge*, No. 07-CV-40305, 2009 WL 415506 (D. Mass. Jan. 15, 2009) ................................................................................................................................ 24

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................................ 12

**Statutes**

42 U.S.C. § 1983 .......................................................................................................... 2
42 U.S.C. § 1985 .......................................................................................................... 2
M.G.L. c. 151B ........................................................................................................... 26
M.G.L. c. 272 § 98 .................................................................................................. 2, 22
M.G.L. c. 272, § 92A ................................................................................................. 23

**Rules**

Rule 12(b)(6) ................................................................................................ 2, 24, 25, 33
Rule 8(a)(2) ................................................................................................................. 33
Rule 8(a)(3) ................................................................................................................. 33

Plaintiffs TrailblazHers Run Co., Abeo Powder, Elizabeth Rock, and Frances Ramirez (together, "Plaintiffs") respectfully submit this Consolidated Memorandum in Opposition to the Motions to Dismiss filed by Defendant Boston Athletic Association ("BAA") (ECF No. 23), and Defendants City of Newton (the "City") and John F. Carmichael Jr. (together, "Newton") (together with BAA, "Defendants") (ECF No. 20).[1] For the reasons described below, the Defendants' motions lack merit and should be rejected in their entirety.

## I.   <u>INTRODUCTION</u>

Plaintiffs, a running group of color and three of its members, were subjected to racial profiling and discrimination by the BAA and the Newton Police Department ("NPD") at the 2023 Boston Marathon. For many years, Plaintiffs have organized a cheer zone at Mile 21 of the Marathon—one of the world's oldest and most prestigious marathons. During the 2023 Marathon, Plaintiffs' cheer zone was indistinguishable from numerous others along the route, other than the race of the spectators in their group. Defendants targeted Plaintiffs by with an intimidating police presence throughout the day, disproportionately surveilling and harassing them and obstructing their view of the race.

This discriminatory conduct culminated with a coordinated action by NPD officers and the BAA, in which a phalanx of NPD officers descended on Plaintiffs' cheer zone, forming a human barricade, blocking off the cheer zone from in front and behind, effectively pinning Plaintiffs in. No similarly-situated white spectators were treated in this manner.

Defendants' arguments in support of their Motions to Dismiss fall apart under scrutiny. First, Plaintiffs have more than adequately pled a selective treatment Equal Protection claim,

---

[1] The Court granted leave for this Consolidated Opposition on July 23, 2024. ECF No. 30.

including citing numerous examples of similarly-situated white spectators at the Marathon who were not subjected to the treatment that Plaintiffs were. Second, Plaintiffs have sufficiently demonstrated that the BAA was a joint participant with Newton in violating Plaintiffs' rights, thereby making the BAA a state actor for purposes of Plaintiffs' claims under 42 U.S.C. § 1983. Third, Plaintiffs have properly pled a civil rights conspiracy claim under 42 U.S.C. § 1985, providing a detailed account of how Defendants jointly conspired to violate Plaintiffs' Equal Protection rights. Fourth, Plaintiffs have adequately stated a public accommodations claim under M.G.L. c. 272 § 98. Defendants' overly cramped interpretation of this broadly remedial statute is misguided, including their incorrect argument that Plaintiffs were obligated to exhaust administrative remedies. Fifth, Plaintiffs have adequately pled a claim against Newton under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978), and have appropriately named Defendant Chief Carmichael as a defendant. Finally, Plaintiffs have alleged a substantial risk of recurring harm, thereby justifying the need for injunctive relief.

For these reasons, and as further explained below, this Court should deny Defendants' Motions to Dismiss in full.

## II.  <u>STANDARD OF REVIEW</u>

When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 40 (1st Cir. 2014). The complaint should be read as a whole, "not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013). The allegations "need [] only enough detail to provide a defendant with 'fair notice of what the ... claim is and the grounds upon

2

which it rests.'" *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) (quoting *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir. 2011)).

## III.   **FACTUAL BACKGROUND**

On Marathon Day 2023, the atmosphere was electric as spectators lined the 26.2-mile course of the Boston Marathon, from the starting line in Hopkinton to the iconic "Scream Tunnel" in Wellesley and Heartbreak Hill in Newton. Compl. ¶ 1. As one of the oldest and most prestigious marathons, the Boston Marathon attracts a crowd of spectators from across the country. *Id.* Plaintiffs arrived at Mile 21 as early as 5:30 A.M. to set up their cheer zone, a tradition they have upheld for the past four years alongside other running groups led by Black, Indigenous, and/or People of Color ("BIPOC"). *Id.* ¶¶ 20, 25. They gathered over one hundred spectators, predominantly people of color, to support TrailblazHers members participating in the Marathon. *Id.* ¶ 23. The cheer zone was vibrant with tents, a DJ, cheering materials, and a grill, creating an atmosphere of enthusiasm and support. *Id.* ¶ 25.

In marathon culture, including the Boston Marathon, spectators frequently cheer loudly and boisterously, and it is not uncommon for spectators to enter the course briefly to express solidarity and support for runners. *Id*. ¶ 21. Plaintiffs participated in this tradition in cheering for their fellow TrailblazHers marathoners. *Id.* ¶ 27. For example, at approximately 12:30 P.M., as the first runners passed Mile 21, a spectator of color sprayed confetti into the street. *Id.* ¶ 26. When this occurred, an NPD officer, Paul Boyle, abruptly confronted the spectator of color, aggressively demanded identification, and threatened to arrest him. *Id.* ¶ 26. The spectator calmly explained to the officer that he had not obstructed any runners. *Id.* Those who witnessed this were confused by the aggressive police response, as the spectator's conduct was no different from numerous other expressions of excitement that regularly occur at the Marathon. *Id.*

Fifteen minutes after this encounter, as Plaintiffs continued to cheer, NPD officers instructed TrailblazHers' members to move back, even though runners were not being obstructed. *Id.* ¶ 27. Plaintiffs did not observe any NPD officers instructing white spectators in nearby cheer areas to move back. *Id.* As a group of predominantly people of color, Plaintiffs were singled out for harassment while Defendants allowed white spectators to enjoy the Marathon.

Plaintiffs were deeply unsettled by the NPD's presence and conduct, which created apprehension, fear, and tension. *Id.* ¶ 28. Plaintiffs feared further escalation given the long and strained relationship between communities of color and police. *Id.* ¶ 32. Many of TrailblazHers' members became upset and cried out of frustration as they observed only their section being penalized for celebrating and demonstrating excitement. *Id.*

When Plaintiffs inquired why they were being singled out for this treatment, NPD officers stated that they were responding to complaints from the BAA, confirming coordination and complicity among Defendants. *Id.* ¶ 33. Concerned that the BAA had initiated this action, Plaintiffs immediately contacted Suzanna Walmsley, the BAA's Director of Community Engagement. *Id.* The BAA was familiar with TrailblazHers as a BIPOC-led running group and was aware that Plaintiffs would be gathering at Mile 21. Plaintiffs asked Walmsley to call off the NPD officer. *Id.* The NPD officers momentarily left the scene, again reflecting ongoing communication among Defendants. *Id.* ¶ 34.

Moments later, however, a much larger contingent of approximately 20 NPD officers on bikes returned, forming a human barricade that separated Plaintiffs from the runners, obscuring their view of the race and creating an even more menacing environment. *Id.* Concurrently, NPD officers on motorcycles stationed themselves on the street behind the Plaintiffs' cheer zone, effectively surrounding and penning in the spectators in the cheer zone of color. *Id.* Plaintiffs were

alarmed by the heavy police presence in the only visible section of the Marathon with a significant number of spectators of color. *Id.* ¶ 35. Plaintiffs' view of the race was obstructed, and they could no longer cheer on their colleagues, as they were blocked by police. Despite Plaintiffs' efforts to deescalate the situation, the officers remained unresponsive and unwilling to engage. *Id.* ¶ 36. Plaintiffs remained in the cheer zone with their view obstructed until the last few runners finished, and NPD officers remained until close to 4:30 P.M. *Id.* ¶ 39. Newton's Chief of Police, Defendant Carmichael, later confirmed on NPD's official social media platform that the police response at the 2023 Marathon had been coordinated at the highest levels, stating "As Chief of the [NPD]… I stand by my decisions that day…."[2]

Defendants' response to Plaintiffs was markedly different from their response to similarly-situated white spectators. For instance, around Mile 15, a Wellesley family erected a 10-foot blue and yellow balloon arch, an obstruction *within the course* for runners to pass through. *Id.* ¶ 29. As the photos of the balloon arch in the Complaint show, white spectators entered the course and physically interacted with marathoners – giving runners high fives – as they passed through the 10-foot obstruction. *Id.* ¶ 29.  In another occurrence described in the Complaint, a white man, who was not a Marathon participant, not only entered the course but ran alongside a runner until the runner accepted food he was offering. *Id.* ¶ 30. In yet another incident, a white woman and her child entered the course in Newton to hug a runner. *Id.* ¶ 31. In these examples involving white spectators, Defendants did not threaten, intimidate, or intervene despite physical encroachment and material obstruction. *Id.* ¶¶ 29, 31. All of these instances are featured in the well-pleaded Complaint demonstrating disparities along racial lines vis-à-vis similarly situated white people.

---

[2] Plaintiffs simultaneously submit a Request for Judicial Notice. ECF No. 31.

Following the event and the subsequent outcry from many who witnessed how Plaintiffs were singled out for harassment, the BAA issued an apology – not to Plaintiffs but to the NPD, effectively sanctioning, ratifying, and condoning the NPD's actions. *Id.* ¶ 42.

Defendants' actions severely undermined TrailblazHers' mission to promote equity and inclusivity for BIPOC runners. *Id.* ¶ 40. The traumatic experience caused significant emotional distress, having a longstanding effect on Plaintiffs' mental health. *Id.* ¶ 38. Plaintiffs intend to continue attending future Marathons and having a cheer zone, but now face the ongoing threat and fear of further racial profiling, discrimination, and harassment. *Id.* ¶ 43.

## IV.   <u>ARGUMENT</u>

### A.   PLAINTIFFS HAVE SET FORTH SUFFICIENT ALLEGATIONS TO SUPPORT EACH OF THEIR FEDERAL LAW CLAIMS.

1.   <u>Plaintiffs Have Sufficiently Pled A Selective Enforcement Equal Protection Claim.</u>

Both the BAA and Newton argue that the Complaint does not adequately plead a violation of the Equal Protection Clause. However, under governing law, Plaintiffs have more than sufficiently pled this cause of action.

Under the Equal Protection Clause, similarly-situated individuals must be accorded similar governmental treatment. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985). As the First Circuit has held, to establish an Equal Protection claim, a plaintiff must "adduce sufficient evidence from which a rational jury reasonably could conclude that, compared with others similarly situated, [the plaintiff] was selectively treated ... based on impermissible considerations such as race." *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004) (citations omitted); *see also Obele v. Town of Brookline*, No. 20-CV-11117, 2021 WL 828412, at *5 (D. Mass. Mar. 4, 2021) ("In order to prevail… a plaintiff must plead minimally sufficient facts to plausibly allege

they were treated differently from similarly-situated citizens of another race and that the actions taken against them were motivated, at least in part, by their race.").

To determine whether a comparator is "similarly-situated," courts analyze "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Tapalian*, 377 F.3d at 6; *see also Fosu v. Univ. of Rhode Island*, 590 F. Supp. 3d 451, 458–59 (D.R.I. 2022). The inquiry is a fact-specific one that "is not always susceptible to precise demarcation." *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001). Although comparators must be "fair congeners," "[e]xact correlation is neither likely nor necessary…." *SBT Holdings, LLC v. Town Of Westminster*, 547 F.3d 28, 34 (1st Cir. 2008).

Here, Plaintiffs have more than exceeded the bar to adequately plead a selective enforcement claim under the Equal Protection Clause. TrailblazHers, a BIPOC-led running group, and individual Plaintiffs, all Black women, are members of a protected class. Compl. ¶ 9-12. Neither BAA nor Newton dispute that this is adequately pled.

Defendants contend that Plaintiffs have not alleged adequate comparators. Newton does this by claiming that the Complaint alleges that TrailBlazhers is "a group of more than 100 spectators … [who] were impeding the course at Heartbreak Hill in Newton." ECF No. 20 ("Newton Brief") at 3. This is not what occurred—and more importantly for purposes of this motion, is not the factual basis of the Complaint. Rather, as alleged in the Complaint, a member of the cheer zone sprayed confetti into the street and was then aggressively approached and threatened with arrest by the NPD.[3] Compl. ¶ 26. Later an even larger police presence arrived and continued to instruct Plaintiffs to "move back," despite the absence of obstruction. *Id.* ¶ 27.

---

[3] The "confetti cannon" that Defendants repeatedly reference is a hand-held container made of cardboard that launches paper confetti. Compl. ¶¶ 25 & 26.

Plaintiffs were surrounded by approximately 20 NPD officers on bikes who created a human barricade between Plaintiffs and the course. *Id.* ¶ 34. NPD officers on motorcycles also surrounded Plaintiffs from behind the course. *Id.* ¶ 34. Newton has failed to engage with the facts as alleged.

Contrary to Newton's argument, Plaintiffs alleged multiple examples and provided numerous photos of similarly-situated white spectators at the 2023 Marathon in Newton and from previous Marathons. Compl. p.10 n.10, ¶¶ 35 & 37. For example, the Complaint alleges that a white woman and child entered the course, right across the street from Plaintiffs, to physically interact with a runner. *Id.* ¶ 31. The Complaint also cites to an instance where a white reporter on Heartbreak Hill in Newton entered the course with her camera crew to interview spectators along the marathon route. *Id*. 10 n.10. The Complaint also cites an instance where a white couple got married on the course at Mile 20 in Newton. *Id.*  In none of these cases did Defendants intervene— a difference noticed even by white spectators. *Id*. p. 10 n.10, ¶ 31.[4] In addition to these examples, Plaintiffs provided details of additional similarly-situated individuals, including white spectators who gathered around the 10-foot balloon arch on the course to physically interact with runners. *Id.* ¶ 29. The Complaint also alleges that a white non-participant entered the course with food and ran after a marathon runner until he triggered a physical reaction. *Id.* at 30.[5]

To these examples, Newton's best argument is the conclusory statement that they are "very different" from Plaintiffs' circumstances, Newton Brief at 4, but in fact many of these incidents are far *more* problematic. Erecting a balloon arch creates a permanent obstruction on the course,

---

[4] *See* Ally Jarmanning, *Black Boston Marathon Watchers Demand Investigation After Interaction In Newton*, WBUR (April 20, 2023), https://www.wbur.org/news/2023/04/19/boston-marathon-race-police, (Dana Bogan, co-leader of the November Project Boston, commented about the 2023 Marathon incident, "[w]e've done the same things and the police have not come up to us," she said. "The difference is our group is majority white and their group is majority Black.").
[5] Notably, these examples and the many others cited in the Complaint were obtained without the benefit of discovery. Plaintiffs expect to identify more similarly-situated individuals after discovery. *See Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012).

for example, and attracts a crowd of spectators to enter the course and interact with runners. Compl. ¶ 26. Similarly, an individual entering the course and *following* a runner to elicit a physical response is clearly violative of the Defendants' purported interest in keeping the course free of obstructions and non-participants. *Id.* ¶ 30; *see Anderson v. Brennan*, 219 F. Supp.3d. 252, 258 (D. Mass. 2016) (finding plaintiff's comparators are appropriate when "more serious…incidents have been dealt with lightly."). Newton's other attempts to distinguish Plaintiffs' comparators— such as the argument that the runner who was chased down by a spectator with a donut "consented" to the action, Newton Brief at 4—are not only questionable on their facts but fall into the category of "incidental and facially inconsequential" differences. *Barrington*, 246 F.3d at 9.[6]

The cases that the BAA cites are similarly off-point. In *Badio v. G4S Solution, USA*, for example, the court dismissed an Equal Protection claim because the plaintiff made *no allegations* that others were similarly-situated and otherwise failed to provide instances of alleged disparate treatment to support his claim.  No. 19-CV-12591, 2021 WL 102656, at *7 (D. Mass. Jan. 12, 2021);  *DeNicola v. Potter*, No. 19-CV-11391, 2020 WL 3545487, at *7 (D. Mass. June 30, 2020) (same); *Lu v. Smith*, No. 15-CV-14081, 2016 WL 4595206, at *3 (D. Mass. Sep. 2, 2016) (same). Here, Plaintiffs have alleged multiple examples of similarly-situated spectators and instances of disparate treatment. Compl. ¶¶ 29-31.  *Cf. Ayala-Sepulveda v. City of San German*, 671 F.3d 24, 32 (1st Cir. 2012) (emphasis added) ("Ayala presents *no evidence* regarding, for example,

---

[6] Newton's case citations are similarly flawed, in that they are primarily "class-of-one" Equal Protection cases that use a heightened similarly-situated standard. Newton Brief at 4-5 (citing *Pollard v. Georgetown School District*, 132 F. Supp. 3d 208, 223 (D. Mass. 2015), *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001), and *Lattimore v. Trotman*, 651 F. Supp. 3d 366, 374 (D. Mass. 2023). In a class-of-one case, the plaintiff does not allege membership in a protected class, but rather "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). As the First Circuit has held, such cases "require an extremely high degree of similarity between [the plaintiffs] and the persons to whom they compare themselves." *See Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (cleaned up) (emphasis supplied); *see also Rectrix Aerodome Centers, Inc. v. Barnstable Mun. Airport Com'n*, 610 F.3d 8, 16 (1st Cir. 2010) (class-of-one plaintiff must show "identity of entities and circumstances to a high degree").

instances in which heterosexual employees with similar rank and qualifications were not transferred.").

Plaintiffs have set forth substantial specific allegations that they were selectively treated based on race. Compl. ¶¶ 2, 4, 27-31, 35, 37, 51. As the Complaint describes, Plaintiffs were engaged in activities typical of thousands of other spectators on Marathon Day: gathering, cheering, and supporting runners. Compl. ¶¶ 2, 27, 29, 52. Yet they—and they alone—were subjected to repeated demands to "move back" that hindered their ability to celebrate the event and express joy. *Id.* Unlike other similarly-situated white spectators, the selective treatment culminated in Plaintiffs being surrounded on all sides by law enforcement officers, obstructing their view of the race and of their friends and families participating. Compl. ¶¶ 34-36. The menacing police presence persisted from when the first runner approached Mile 21 at mid-day until the race concluded. *Id.* ¶¶ 26-27, 39. A reasonable person would view white spectators who celebrated and strayed onto the course as roughly equivalent to Plaintiffs, spectators of color who did the same. *See Jean v. Brennan*, No. 14-CV-11969, 2016 WL 4926414, at *5 (D. Mass. Sept. 14, 2016) ("Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances."). Indeed, in a number of instances cited in the Complaint, the conduct of the white spectators was significantly more problematic than anything that Plaintiffs did. *See supra* at 8 & 9.

Newton asserts that their actions were "permissible" since all spectators are allegedly prohibited from entering the course. Newton Brief at 5. But this misses the point of a selective enforcement claim. Plaintiffs do not dispute that police can keep spectators off the course, but they must do so with an equal hand. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("We of

course agree . . . that the Constitution prohibits selective enforcement of the law based on considerations such as race."); *see e.g. Obele v. Town of Brookline*, No. 20-CV-11117, 2021 WL 828412, at *5 (D. Mass. Mar. 4, 2021) (noting that it is "well established that a state official violates the [] Equal Protection Clause if they decide to selectively subject citizens to search or seizure because of their race".).

The BAA constructs a similar strawman argument, stating that "police line the course at multiple locations," and that what occurred in front of Plaintiffs' cheer zone was no different. ECF No. 24 ("BAA Brief") at 15. But this also ignores what the Complaint alleges in great detail: that this incident was not the standard police presence that can be found along the Marathon route, but rather was a large contingent of police that appeared in front of (and behind) Plaintiffs' cheer zone after the race had begun, with officers on bicycles and motorcycles effectively penning in the people of color. Compl. ¶ 34. Any effort to normalize this manner of engagement is disingenuous and alarming. As observers noted, the policing had nothing to do with safety: "the difference is our group is majority white and their group is majority Black."[7]

As the First Circuit has repeatedly acknowledged, discriminatory animus is rarely displayed openly; instead, it can often manifest subtly or through unconscious bias. *See Thomas v. Eastman Kodak Co.,* 183 F. 3d 38,59 (1st Cir. 1999) ("The ultimate question is whether the [plaintiff] has been treated disparately 'because of race.' This is so regardless of whether the [defendant] consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias.")*; Rios-Colon v. Toledo-Davila,* 641 F.3d 1, 5 (1st Cir. 2011) ("[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's

---

[7] Jarmanning, *supra* n.4.

guarantee of equal protection."). That is why the "similarly-situated" analysis exists: where—as here—the only distinguishing characteristic between similarly-situated comparators is their race, this provides powerful evidence of racial discrimination. *See Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) ("The fact of this discrimination is admitted. No reason for it is shown… no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which, in the eye of the law, is not justified.").

The BAA also argues that being selectively targeted for police enforcement and surrounded by an intimidating presence of officers throughout the race does not qualify as a "deprivation" of rights. Unsurprisingly, it cites no caselaw because courts have long held that racial profiling deprives victims of their rights and dignity, in a manner that is fully cognizable under Section 1983. *See Curtis v. Loether*, 415 U.S. 189, 196 n.10 (1974) (describing racial discrimination as a "dignitary tort"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975) (holding that immigration officers could not randomly stop cars near the U.S. border where their only ground for suspicion was the person's apparent Mexican ancestry).[8]

Particularly at this early stage of litigation, Plaintiffs have more than adequately pled an Equal Protection claim of selective treatment based on race.[9]

---

[8] The BAA also argues that a photo from the Complaint undermines Plaintiffs' claims by showing white spectators standing next to Plaintiffs incidentally obstructed by police too. BAA Brief at 15. This mischaracterizes what is obvious from the photographs and from the well-pleaded allegations in the Complaint: that police were positioned in front of spectators of color in a cheer zone organized by and for spectators of color. Compl. ¶¶ 29-31. The fact that some white onlookers may have been incidentally blocked does not detract from Plaintiffs' claims. *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 274 (1st Cir. 2022) (quoting *Bostock v. Clayton County*, 590 U.S. 644, 662 (2020)) ("If an employer discriminates both against Black employees based on their race and against non-Black employees based on their status as non-Black people associating with Black people, that employer "doubles rather than eliminates Title VII liability.").

[9] Because the similarly-situated inquiry is highly fact-intensive and contextual, courts have often noted that it is generally unsuitable for resolution at the motion to dismiss stage. *Joubert-Vazquez v. Alvarez-Rubio*, 820 F. Supp. 2d 289, 295 (D.P.R. 2011) (in relevant part, motion to dismiss denied); *Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 375 (D. Mass. 2022) (same).

2.  <u>Plaintiffs Have Alleged That The BAA Is A State Actor For The Purposes of Section 1983.</u>

The BAA also incorrectly argues that it is not a state actor for purposes of Section 1983, which imposes liability on actors who, while acting under the color of state law, deprive or cause the deprivation of any "rights privileges, or immunities secured by the Constitution and laws." 42 U.S.C. §1983.

The BAA starts by making the sweeping statement that it "cannot" act under color of state law, BAA Brief at 7, a proposition that is simply wrong as a matter of law.  Well-established Supreme Court jurisprudence rejects the notion that private actors "cannot" be considered state actors.  *See, e.g.*, *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 302 (2001) ("[the Fourteenth Amendment's] ambit cannot be a simple line between States and people operating outside formally governmental organizations"); *Lebron v. Nat'l R.R. Passenger Corp*., 513 U.S. 374, 375 (1995) ("The Constitution constrains governmental action by whatever instruments or in whatever modes that action may be taken."). Constitutional violations "may be manifested in a nearly infinite variety of applications," and thus, a plaintiff is not required to "intone some catechism of magic words to describe the relationship between [a] private party and the state." *Alianza Americas v. DeSantis*, No. 22-CV-11550, 2024 WL 1381926, at *24 (D. Mass. Mar. 29, 2024). The task of "[d]etermining whether a private party's conduct amounts to state action demands a fact-intensive and context-specific inquiry." *Id.*

The Supreme Court has outlined several ways in which private parties may be considered state actors under Section 1983. Under the "nexus/joint action" analysis, Section 1983 liability extends to private parties who are willful participants in joint action with the state or conspire with a state official to violate constitutional rights. *See Dennis v. Sparks*, 449 U.S. 24 (1980) (private parties who conspired with and participated in bribery of judge acted under color of state law);

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (restaurant may be considered state actor if its employees worked in conjunction with police to deny service to white teacher in company of Black students).[10] The nexus/joint action analysis requires an evaluation of whether the government has "so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). Contrary to the BAA's assertions, this inquiry does not hinge on whether the private entity "is the government itself" or is considered a governmental actor for all purposes. BAA Brief at 8, 11, 13. Rather, the inquiry focuses on whether the private entity was a willful participant with the state for purposes of the constitutional violation. *See Dennis,* 449 U.S. at 27-28.

"Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards." *Brentwood*, 531 U.S. at 302. In fact, "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton*, 382 U.S. 296, 299 (1966).

This "entwinement" between public and private entities is precisely what the Complaint alleges—for months preceding the racial profiling that occurred at the 2023 Marathon and during the incident itself. As the Complaint sets forth, the BAA organizes the Boston Marathon every year. This requires the BAA and law enforcement agencies in jurisdictions across the 26.2 miles of the course, including the NPD, to jointly and actively collaborate starting months beforehand. Compl. ¶ 50. The BAA and NPD "enter [] into so symbiotic a relationship" in order to have a

---

[10] In addition to the nexus/joint action test, a private party may also be considered a state actor within the purview of Section 1983 under the "state compulsion" and the "public function" tests. *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 52 (1st Cir. 2009). Plaintiffs do not bring their claim under either of these tests.

successful race. *See Alianza America*, 2024 WL 1381926, at *24. Indeed, Defendants do not dispute that they are materially linked. *See* Newton Brief at 11 (admitting "necessarily required collaboration"); BAA Brief at 4 ("working together to ensure orderly coordination").[11] For example, during the pre-marathon meetings, the BAA and other stakeholders, including the NPD, discuss lessons learned from previous Marathons and explore modifications to plans and activities on Marathon day.[12]

On Marathon day, the coordination intensifies, with the BAA and NPD communicating and acting in real time to coordinate public safety responses and provide situational awareness of activities along the marathon route.[13] The Marathon traverses the public streets of Newton, and crowds line Newton's public sidewalks. The Defendants are inextricably intertwined.

It is against this backdrop of extremely close coordination between the BAA and Newton that Plaintiffs and other spectators of color were specifically targeted, harassed, and racially profiled. Compl. ¶¶ 26-39. In fact, NPD officers explicitly stated that they were acting on BAA's orders when they confronted Plaintiffs. Compl. ¶ 33.[14] Despite other spectators also entering the course, Compl. ¶¶ 29-31, Defendants fixated on Plaintiffs' cheer zone because of the BAA's insistence and demands. Compl. ¶¶ 28, 32, 35, 43. After Plaintiffs contacted a BAA team member,

---

[11] Similarly, at a joint press conference, Massachusetts Emergency Management Agency (MEMA) Acting Director Dawn Brantley described the public safety preparations for the 2023 Marathon: "Public safety planning for this world-class race begins months in advance of Marathon Monday and the many meetings, calls, and coordination sessions ensure a cohesive effort and approach." BAA Brief at 4 n.8.

[12] Massachusetts Emergency Management Agency et al., *After Action Report for the Response to the 2013 Boston Marathon Bombing*, at 71-72 (Dec. 2014), https://www.policinginstitute.org/wp-content/uploads/2015/05/after-action-report-for-the-response-to-the-2013-boston-marathon-bombings_0.pdf.

[13] *Id.* at 72.

[14] Mike Pescaro & Glenn Jones, *Black Boston Marathon Spectators Say They Were Overpoliced in Newton*, NBC10 Boston (Apr. 19, 2023), https://www.nbcboston.com/news/local/black-boston-marathon-spectators-say-they-were-overpoliced-in-newton/3026260/ ("Newton police said in a statement Tuesday that the Boston Athletic Association notified it three times during the race about spectators going past the rope barrier and impeding runners.") *accord* Newton Brief at 3 ("The Newton Police Department received and responded to multiple calls from the BAA regarding these spectators.").

the harassment briefly paused – demonstrating again the BAA's extraordinary influence over NPD on Marathon day. Compl. ¶ 34.

Much like dance partners moving in sync, the BAA and NPD operate in a tightly and extensively coordinated manner months before the Marathon, and in particular along the Marathon route the day of the race. They are indissolubly linked. The BAA depends on NPD for safety, crowd control, and surveillance, particularly after the 2013 Marathon bombing. BAA Brief at 4. Conversely, NPD looks to the BAA for guidance, training, and coordination among all involved agencies.[15] It is this high degree of mutual reliance and coordination between the BAA and law enforcement agencies that demonstrates these entities are joint actors for purposes of evaluating the well-pleaded constitutional violations. *See Carmack v. Massachusetts Bay Transp. Auth.*, 465 F. Supp. 2d 18, 29 (D. Mass. 2006) (an important factor in the nexus/joint action analysis includes "the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs"); *see also Citizens To End Animal Suffering And Exploitation, Inc. v. Faneuil Hall Marketplace, Inc*., 745 F. Supp. 65, 74 (D. Mass. 1990) (operator of Faneuil Hall is a state actor, where it leases its property from the City of Boston, the City reserves an easement for the public's access and passage, and "the City depends on the ability of the Marketplace to attract business to the area.").

The BAA makes the unsupported argument that because Newton is named as a Defendant in this lawsuit, the BAA *cannot* also be a party. BAA Brief at 8. The BAA cites no authority for this proposition because none exists. Quite the contrary: there is a long line of Section 1983 cases where both government entities and private parties are named (including cases cited by the BAA itself). *See*, *e.g.*, *Dennis*, 449 U.S. at 24 (private oil company and judge named); *Alianza America*,

---

[15] *Id.*

2024 WL 1381926 (private plane company and state officials named); *Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011) (private bus company and state named); *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1 (1st Cir. 2005) (public hospital and physicians named); *Dietrich v. John Ascuaga's Nugget,* 548 F.3d 892 (9th Cir. 2008) (private company and city named). Further, the BAA's theory is completely in opposition to the nexus/joint action test, which requires a showing that both the private party and the state actor are responsible for the constitutional violation. *See Adickes*, 398 U.S. 144; *Evans,* 382 U.S. 296.

The BAA similarly errs in claiming that calling the police "categorically" cannot constitute state action.  BAA Brief at 9.  As support for this proposition, the BAA cites two out-of-circuit cases that are fundamentally different from the matter at hand. In *Dietrich*, *supra*, the plaintiff sued a private business alleging First Amendment violations but put forth only a "bare allegation" that the business and police acted together, with "no evidence" of any joint action. 548 F.3d at 892. Similarly, in *Ginsberg v. Healy Car & Truck Leasing, Inc*., 189 F.3d 268 (2d. Cir. 1999), a customer who had a dispute with a truck rental business sued the business for calling police on him. *Id.* at 268. Though the plaintiff claimed that the police and the business were tightly connected, he presented no evidence to support his claim even after discovery, and the case was dismissed on summary judgment.  *See id*. at 271 (evidence showed police had come to the business only twice in thirty-two years). Here, by contrast, there is extensive evidence demonstrating the close and ongoing relationship between the BAA and NPD, which extends over months and years, intensifies on the day of the Marathon, and was the driving force behind the illegalities outlined in the Complaint. Compl. ¶¶ 2, 4, 25-39. The BAA directed police activity, for example, when they requested the NPD to momentarily back-off. Compl. ¶ 33. By the BAA's own admission: they "worked together to ensure orderly coordination." BAA Brief at 9-10.

In contrast to the BAA's out-of-circuit citations, the First Circuit has explicitly held that where there is a close pre-existing relationship between a private actor and police that results in a deprivation of rights, Section 1983 liability is appropriate. In *Wagenmann v. Adams*, a private individual (Anderson) called the police to report that the father of his son's fiancée was engaged in threatening behavior toward his son.  829 F.2d 196 (1st Cir. 1987). The police subsequently arrested the father, who later sued both the police and Anderson for wrongful arrest and other civil rights violations. *Id.* Relying on the close pre-existing relationship that Anderson had with police, the First Circuit upheld a finding that he was appropriately considered a state actor. While agreeing that "merely initiating a good-faith request for police protection" may not be sufficient to attach liability, the Court held that "[t]hat tenet ... does not carry the day…." *Id.* at 210-11. As in the instant case, Anderson enjoyed a close and ongoing and relationship with police, allowing him "to bypass regular police emergency procedures…." *Id.* Similarly, the Court found evidence that the decision to arrest the plaintiff "was a collective one, … rather than solely an official one." *Id.* at 211.  Here, too, the sequence of events outlined in the Complaint demonstrates (or at a minimum creates a reasonable inference) that the decision to respond with a show of intimidating force against Plaintiffs was a collective decision between BAA and the NPD, based on a pre-existing relationship of close collaboration. *See* Compl. ¶¶ 33 & 34. (noting the BAA's substantial influence on NPD).

This First Circuit jurisprudence follows U.S. Supreme Court precedent. In *Adickes*, the Supreme Court held that a teacher could seek relief under Section 1983 against a restaurant for denying her service when she was with six Black students, if she could show that the restaurant and police "somehow reached an understanding to deny [her] service." 398 U.S. at 152. Here, the BAA's direct influence and coordination with the NPD exemplify a comparable conspiracy to

deprive the Plaintiffs of their rights. The pattern of behavior outlined in the Complaint—initial harassment, brief cessation, and intensified harassment—underscores an intentional and concerted effort to violate Plaintiffs' rights, elevating the BAA's role to that of a principal actor, alongside Newton, in the discrimination and misconduct. Compl. ¶¶ 26 & 27, 33-36.

In evaluating Defendants' motions to dismiss, the Court must consider all reasonable inferences in Plaintiffs' favor and need not find conclusive evidence of a conspiracy at this stage. It need only determine that the allegations present a reasonable inference of coordination and agreement. And, as both the Supreme Court and the First Circuit have recognized, it is often circumstantial evidence that establishes a civil rights conspiracy. *See Wagenmann*, 829 F.2d at 211 (highlighting "the settled principle that circumstantial evidence can support a finding of concerted action"); *see also Adickes*, 398 U.S. at 158 (civil rights conspiracy may be established through sequence of events that allow an inference of a "meeting of the minds").

Based on the allegations in the Complaint, Plaintiffs have adequately pled sufficient facts to establish the BAA as a state actor given its symbiotic relationship with the NPD and material level of involvement in racially profiling the Plaintiffs and singling them out for aggressive police response.

3.  Plaintiffs Have Stated A Civil Rights Conspiracy Claim.

To plead a civil conspiracy claim, a plaintiff must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Ramirez v. City of Worcester*, 252 F. Supp. 3d 29, 33 (D. Mass. 2017). Evidence of an explicit agreement is not required; it is sufficient to present "sufficient circumstantial evidence for a reasonable jury to find the existence of a civil

rights conspiracy without speculation and conjecture." *Id.* The alleged conspiratorial conduct requires "some racial, or perhaps otherwise class-based invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

Plaintiffs easily meet the threshold required. As an initial matter, the Complaint outlines how the BAA and Newton engage in ongoing coordination spanning several months prior to Marathon day. Compl. ¶¶ 50 & 51. Then on Marathon day, this collaboration intensifies, with both parties working hand-in-hand. *Id.* Defendants themselves acknowledge this extensive collaboration. Newton Brief at 11 ("The [Boston Marathon]'s vast and complex security needs …. necessarily require collaboration …); BAA Brief at 4 ("As happens every year… local police from all neighboring communities … worked together to ensure orderly coordination of all government functions").

It is against this backdrop of intensely close coordination that the events in question arose. Additionally, during the 2023 Marathon, the BAA took an affirmative step in furtherance of the conspiracy by enlisting the NPD officers to target and harass Plaintiff's and other spectators of color on Mile 21—despite there being many other individuals engaged in similar (indeed more problematic) conduct in Newton and elsewhere. Compl. ¶¶ 26 & 37. Defendants were complicit in this targeting.

Notably, the NPD did not approach Plaintiffs or begin to harass them until summoned and directed by the BAA: "The Newton Police Department received and responded to multiple calls from the BAA." Newton Brief at 3; *see also* Compl. ¶ 33. Even after Plaintiffs contacted the BAA requesting that the police be called off, the withdrawal was only momentary; shortly thereafter, an even larger police force appeared at Mile 21. Compl. ¶ 34. Further, Plaintiffs have alleged that Defendants' concerted actions deprived them of their constitutional right to Equal Protection.

Compl. ¶¶ 3, 4, 40, 42, 49, 53.  These allegations, combined with the reasonable inferences that flow from them, establish a conspiracy within the meaning of the term.

Newton wrongly asserts that the BAA's calls to the NPD "cannot constitute evidence of a civil rights conspiracy as a matter of law." Newton Brief at 9. But the cases cited by Newton are unavailing. In *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026 (D. Minn. 2010), the plaintiff alleged that the police conspired with her former boyfriend, who was also a police officer, by conducting an investigation into an altercation between them and subsequently bringing charges solely against her. The police officers in *Lawrence* had no prior knowledge of the plaintiff's former boyfriend and interacted with him only as necessary for them to perform their routine investigatory duties, maintaining minimal contact beyond that. *Id.* In contrast, Plaintiffs have presented facts demonstrating that the BAA and the NPD were deeply intertwined in purpose and action, coordinating extensively in preparation for the Marathon months in advance and on the day of the event. Compl. ¶¶ 50 & 51.

Additionally, the Defendants' actions were synchronized: the BAA complained, the NPD approached Plaintiffs, the Plaintiffs urged the BAA to call off the police, and the police presence momentarily decreased only to return with greater force. Compl. ¶ 34. The escalation – especially after the BAA's communication with NPD—demonstrates that Defendants coordinated in furtherance of the civil rights deprivation. These cumulative allegations are more than sufficient to adequately allege a civil rights conspiracy. *See Jesionowski v. Beck*, 937 F. Supp. 95, 105 (D. Mass. 1996) (denying summary judgment when there was sufficient circumstantial evidence of a conspiracy between defendants).

Similarly, Newton's reliance on *Humphrey v. Comoletti* is misguided. No. 15-CV-14170, 2017 WL 1224539, at *8 (D. Mass. Mar. 31, 2017). In *Humphrey*, the conspiracy claim was

dismissed because the plaintiff failed to present any facts supporting the allegation that the police officers and the private party conspired against him based on his race. *Id.* Here, however, Plaintiffs have presented detailed factual allegations showing that the BAA and the NPD selectively implemented their policies and targeted only Plaintiffs and other spectators of color. Compl. ¶¶ 2, 29-37, 46, 49, 53, 58.

Plaintiffs have adequately stated a civil rights conspiracy claim against Defendants.

### B.  PLAINTIFFS HAVE STATED A PUBLIC ACCOMMODATIONS LAW CLAIM UNDER M.G.L. c. 272, §98.

Contrary to the arguments of both sets of Defendants, Plaintiffs have also sufficiently pled their public accommodations claim. Massachusetts' Public Accommodations Law prohibits "distinction, discrimination or restriction on account of race… relative to the admission of any person to, or his treatment in any place of public accommodation…." M.G.L. c. 272, § 98 (hereinafter "Section 98"). Defendants do not dispute that Plaintiffs are members of a protected class. They do, however, challenge that: (1) the Boston Marathon is a place of public accommodations; and (2) that Plaintiffs were denied the same terms and conditions than other spectators at the Boston Marathon. Plaintiffs address each in turn.

1. <u>The Boston Marathon Falls Within the Scope of the Public Accommodations Law.</u>

Under Massachusetts law, a place of "public accommodation … shall be deemed to include any place, … which is open to and accepts or solicits the patronage of the general public." M.G.L. c. 272, § 92. "[B]ecause the statute is an antidiscrimination statute, [courts] … give it 'a broad, inclusive interpretation' to achieve its remedial goal of eliminating and preventing discrimination." *Currier v. National Bd. of Med. Examiners*, 462 Mass. 1, 18 (2012); *see also Brooks v. Martha's*

*Vineyard Transit Authority*, 433 F. Supp. 3d 65 (D. Mass. 2020); *CapoDiCasa v. Town of Ware*, No. 17- CV-30079, 2018 WL 3966303 (D. Mass. Aug. 17, 2018).

To that end, the Supreme Judicial Court ("SJC") has made clear that the definition of "place of public accommodation" is expansive, and that the protections of the law extend beyond traditional physical locations such as stores and restaurants. *Currier*, 462 Mass. at 19 (holding that a private corporation responsible for administering medical licensing exams qualifies as a place of public accommodation); *Local Finance Co. v. Massachusetts Commission Against Discrimination*, 355 Mass. 10, 15 (1969) (holding that a finance company engaging in discriminatory loan practices constitutes a place of public accommodation); *Jones v. Baystate Health, Inc.*, No. 22-CV-10417, 2022 WL 21778544, at *8 (D. Mass. Nov. 4, 2022) (finding a non-profit hospital is a place of public accommodations). Additionally, "place[s] of public amusement, recreation, sport, exercise or entertainment" are enumerated examples under the statute. M.G.L. c. 272, § 92A. *See Concord Rod & Gun Club, Inc. v. Massachusetts Comm'n Against Discrimination*, 402 Mass. 716, 720 (1988) (finding a fishing and hunting club to be a place of public accommodations).

Here, the Boston Marathon clearly qualifies as a place of public accommodation, as it is open to and actively solicits the participation of the general public. Compl. ¶ 56. Moreover, the event falls directly under one of the statute's enumerated examples—a source of "entertainment, recreation, and amusement to the participants as well as to the spectators." M.G.L. c. 272, § 92A.

The BAA wrongly argues that because the public sidewalk is not under its control, Plaintiffs' claim fails. BAA Brief at 18. There is no legal support for such an assertion. As the SJC has held in a similar context, "[n]othing in § 92A …suggests that a boardwalk or other public highway loses its character as a place of public accommodation… merely because a parade is conducted there." *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 418 Mass. at 247, *rev'd on*

*other grounds sub nom Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos*., 515 U.S. 557 (1995).[16]  Even if the specific reference in the law to "place[s] of public amusement, recreation, sport, exercise or entertainment" did not apply—which it does—given the broad and liberal construction of the public accommodations law, a 26-mile road race that is run on the public streets and which cities and towns tout for months in advance as an event for the public to enjoy surely qualifies as a place of public accommodation. *See Currier*, 462 Mass. at 1; *Local Finance Co.*, 355 Mass. at 10.

To avoid this uncontestable point, Newton's ill-fated strategy is to once again ignore what the pleadings actually allege. Contrary to Newton's argument, Plaintiffs never alleged that they wanted to be *participants* in the Marathon; rather the Complaint focuses on their experience as spectators. Newton Brief at 13-15, Compl. ¶¶ 2, 5, 20, 23-28. As already noted, every year, thousands of spectators, including Plaintiffs, gather along the course to watch and support the runners—encouraged to do so not only by the BAA but by Newton and all the other municipalities through which the course travels. *Id.* The statute's clear language, coupled with judicial interpretations, places the Boston Marathon squarely within the purview of the Public Accommodations Law.

2. Defendants Denied Plaintiffs the Same "Conditions and Limitations" As Others Similarly-Situated.

At this juncture, Plaintiffs have more than sufficiently satisfied their "modest burden" under Rule 12(b)(6) by providing multiple examples of similarly-situated individuals, both at the 2023 Boston Marathon and previous Marathons. Compl. ¶¶ 29-37. *Wright v. Town of Southbridge*, No. 07-CV-40305, 2009 WL 415506, at *6 (D. Mass. Jan. 15, 2009) (finding plaintiffs'

---

[16] Although the Supreme Court subsequently reversed the SJC's decision, it did so on First Amendment grounds, not because it took issue with the premise that an event that "occurs on the public streets" is a public accommodation.

allegations, "albeit in minimal fashion, that the selective enforcement was intended to punish [them] for their protest activities" can survive 12(b)(6) motion). Here, Plaintiffs provided ample evidence to support their claim of similarity. All the examples alleged involve white spectators entering the marathon course, but without any corrective action taken by Defendants. Compl. ¶¶ 27 & 31.

Ignoring this extensive detail, the BAA focuses solely on the spectator of color who sprayed confetti into the street to justify the NPD's action. BAA Brief at 15, 19. This attempt is both dismissive and absurd—a foot-long hand-held device for launching harmless confetti paper does not justify the overwhelming police response described in the Complaint. If the goal were truly to keep the marathon course unobstructed, the removal of a 10-foot balloon arch with spectators gathered around physically touching runners should surely raise more serious concerns, Compl. ¶ 29, as should non-participants running along the course with marathoners. *Id.* ¶ 30. Yet it was only Plaintiffs' cheer zone, a group of predominately spectators of color, that was immediately confronted and surrounded, from both ends, with a legion of police officers in bikes and motorcycles for hours. Compl. ¶¶ 26-28, 31-36. The only immutable characteristic differentiating those groups of spectators and Plaintiffs is their race. Compl. ¶ 27 & 31.

Plaintiffs have successfully pled a public accommodations claim.

3. <u>Plaintiffs Are Not Required to Exhaust Administrative Remedies With The Massachusetts Commission Against Discrimination Before Commencing Suit.</u>

Both sets of Defendants similarly err in claiming that Plaintiffs must exhaust administrative remedies before filing their public accommodations claim in court. Newton Brief at 15-17, BAA Brief at 18-19.  Courts have repeatedly found Defendants' argument to be incompatible with the relevant statutory language, however. *See Kaiser v. Kirchick*, 662 F. Supp. 3d 76, 97 (D. Mass. 2023); *LaBonte v. Riverside Park Enterprises, Inc*., No. 22-CV-30046, 2022 WL 17253663, at *8

(D. Mass. Nov. 28, 2022); *CapoDiCasa*, 2018 WL 3966303, at \*6*; Peters v. Boston Properties, Inc.*, No. 2084-CV-02447, 2021 WL 3493907, at \*5 (Mass. Super. June 15, 2021).

Although victims of discrimination can file a range of complaints with the Massachusetts Commission Against Discrimination ("MCAD"), the specific complaint procedures outlined in M.G.L. c. 151B are only *required* for violations of Section 4 of the chapter. *See Peters*, 2021 WL 3493907, at \*5. Violations of Section 4 involve employment and housing discrimination. M.G.L. c. 151B, § 4. The plain language of the statute is unambiguous: "as to acts declared unlawful by Section 4, the administrative procedure provided in this chapter … shall… be exclusive." M.G.L. c.151B, § 9. The law does not extend this exclusivity provision to violations of the Public Accommodations Law. *See LaBonte,* 2022 WL 17253663, at \*8; *CapoDiCasa*, 2018 WL 3966303, at \*5 ("On its face, the plain language of § 5 of 151B does not require administrative exhaustion prior to the filing of a complaint pursuant to the Public Accommodation Law."); *see also Kaiser*, 662 F. Supp. 3d at 97 (quoting *Peters*, 2021 WL 3493907, at \*5 ) ("[A] plaintiff alleging discrimination in a place of public accommodation is not required to exhaust the administrative remedies available under [M.G.L. c.] 151B, § 5.").

Furthermore, M.G.L. c. 151B, § 5 explicitly states that MCAD proceedings "shall not be a bar to proceedings" under Section 98. And the fact that the SJC has permitted public accommodations lawsuits to proceed in the absence of any MCAD proceeding bolsters this plain language interpretation of the statute.  *See Currier*, 462 Mass. at 4.  As the *Peters* Court noted, the SJC in *Currier* "held that the plaintiff was entitled to summary judgment on her claim even though *she* had *not* proceeded before the MCAD prior to filing suit in Superior Court." *Peters*, 2021 WL 3493907, at \*4 (emphasis in original).

While acknowledging this extensive authority, Newton cites to public accommodations cases that do not address the exhaustion requirement at all. *See Brooks*, 433 F. Supp. 3d at 65 (no examination of M.G.L. c. 151B's statutory carve-out for Section 98); *Quarterman v. Springfield*, 716 F. Supp 2d 67, 77 (D. Mass. 2009) (same); *Do Corp. v. Town of Stoughton*, No. 13-CV-11726, 2013 WL 6383035 at *10  (D. Mass. Dec. 6, 2013) (same); *Griffiths v. Town of Hanover*, No. 11-CV-12115, 2012 WL 3637791 at *4(D. Mass. Aug. 21, 2012) (same); *East Chop Tennis Club v. MCAD*, 364 Mass. 444, 450 (1973) (same); *Bush v. Fantasia*, No. 21-CV-11794, 2022 WL 4134501, at *1 (D. Mass. Sept. 12, 2022) (same).

Next, Newton cites employment cases, which indisputably *are* governed by MCAD's exhaustion requirement. Newton Brief at 15-16 (citing *Everett v. 357 Corp.*, 453 Mass. 585 (2009) (employment discrimination); *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 585 (1994) (same); *Town of Brookline v. Alston*, 487 Mass. 278, 294 (2021) (same); *Green v. Wyman-Gordon Co.*, 422 Mass. 551 (1996) (sexual harassment in the workplace)). These employment cases are immaterial and inapplicable to Plaintiffs' well-pled public accommodations claim.

This Court should follow the reasoning of the *CapoDiCasa*, *LaBonte*, *Kaiser*, and *Peters* courts, which provide comprehensive and compelling analyses of the statute and find there is no exhaustion requirement for public accommodations claims.

### C.   PLAINTIFFS HAVE SUFFICIENTLY PLED A *MONELL* CLAIM AGAINST NEWTON.

1. Under *Monell*, Newton is Liable for the NPD's Actions At the 2023 Marathon.

Newton also argues that they cannot be held liable under a *respondeat superior* theory "solely because [they] employ [] a tortfeasor…." Newton Brief at 5. But this is not what Plaintiffs allege.  As the Complaint clearly sets forth, the NPD's response to Plaintiffs' cheer zone was not

the action of a lone officer acting on his own—rather, it was a coordinated and orchestrated response made by the City itself.  Under long-standing precedent, that is sufficient for liability to attach to Newton. *See Monell*, 436 U.S. at 694. A municipality can be liable, for purposes of § 1983, "when [its] execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury." *Id.* at 694. This ensures that municipalities are only held liable for "those deprivations resulting from the decisions of … those officials whose acts may fairly be said to be those of the municipality." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403-404 (1997).

Courts have recognized that a single decision may give rise to Section 1983 liability when the government action can be attributed to the final municipal decisionmaker. "If the decision to adopt a particular course of action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnat*i, 475 U.S. 469, 470 (1986); *see also Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008) ("it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances"). Moreover, the existence of an unconstitutional policy or custom can be inferred from the event itself. *See Bordanaro v. McLeod,* 871 F.2d 1151, 1157 (1st Cir. 1989) ("where other evidence of the policy has been presented and the 'single incident' in question involves the concerted action of a large contingent [of government actors], the event itself provides some proof of the existence of the underlying policy or custom").

As Plaintiffs' well-pleaded Complaint details, for the 2023 Marathon, the NPD's response was not the action of one rogue police officer but a concerted effort involving approximately 20

officers who built a human barricade on bikes and officers on motorcycles surrounding Plaintiffs behind the course. Compl. ¶ 34-39.  This police force did not dissipate for hours. *Id.*  Further, following the 2023 Marathon, Defendant Carmichael—a final policymaker—explicitly took credit for the NPD's conduct.[17] Reacting to the news of this lawsuit, Defendant Carmichael posted on the NPD's official X account, the social media platform formerly known as Twitter: "As Chief of the [NPD]… I stand by *my decisions* that day, and more importantly, I stand by our officers who acted appropriately, respectfully and as expected."[18] (emphasis added). As the final policymaker, by this statement, Defendant Carmichael acknowledged not only that he was "the moving force behind [Plaintiffs'] constitutional violation," but that he would repeat his actions. *Bordanaro*, 871 F.2d at 1162. At this stage, Plaintiffs have satisfied their burden and this Court should dismiss Defendants' motions in their entirety.

### D.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.

1.   Plaintiffs Have Properly Named Defendant Carmichael Because They Seek Future-Looking Injunctive Relief.

Newton also claims that Defendant Carmichael is improperly named as a defendant, but this ignores that Plaintiffs seek future-looking injunctive relief. Compl. Prayer for Relief at 18. Because the Supreme Court created an exception to Eleventh Amendment immunity, per *Ex Parte Young*, Plaintiffs have appropriately sued Defendant Carmichael in his official capacity.  *See Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002) (citing *Ex Parte Young*, 203 U.S. 123, 159-60 (1908)).

---

[17] Newton's charter and applicable caselaw make clear that Defendant Carmichael, as police chief, is a "final policymaker." *Id.* at 1157 (finding a police chief to be a final policymaker based on testimony that his decisions represented official law enforcement policy); *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987) (finding police chief as final policymaker).

[18] *See* Request for Judicial Notice, (Newton MA Police Dept., @newtonpolice (Apr. 12, 2024)), available at: https://x.com/newtonpolice/status/1778868116954456246?s=46&t=ajrdHQ5P37gaHd29H_R1Ug.).

To determine whether a plaintiff has alleged a proper *Ex Parte Young* claim, a court need only conduct a "straightforward inquiry" as to whether the plaintiff alleged an ongoing violation of federal law and seeks relief characterized as prospective. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 648–49 (2002); *Bernier-Aponte v. Izquierdo-Encarnacion*, 196 F. Supp. 2d 93, 102 (D.P.R. 2002). Here, Plaintiffs' Complaint and Prayer for Relief—seeking to enjoin Defendants from "discriminating against Plaintiffs and their members and depriving them of equal opportunity to participate as spectators of the Boston Marathon"—satisfies this straightforward inquiry. Therefore, Plaintiffs have sufficiently alleged their Section 1983 claims against Newton.

2.  <u>Plaintiffs Have Demonstrated A Substantial Risk That Harm Will Occur to Obtain Injunctive Relief.</u>

The BAA similarly errs in its argument that Plaintiffs have not adequately alleged the need for injunctive relief.  BAA Brief at 19-20. When requesting prospective injunctive relief, a plaintiff must allege a threat of future injury. *See Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 151 (D. Mass. 2011). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). *see also Connor B. ex rel. Vigurs*, 771 F. Supp. 2d at 151.

Here, Plaintiffs have alleged their intention to attend and set up a cheer zone at future Boston Marathons, an event that has taken place on an annual basis for more than a century and is expected to continue indefinitely.  The BAA's close coordination with the NPD and other police

departments is similarly long-standing and ongoing. Compl. ¶ 43. This scenario is therefore markedly different from the *Lyons* case, cited by the BAA, where the plaintiff's future injury depended on the random or unauthorized use of a chokehold by a police officer. BAA Brief at 19-20; *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02 (1983). Here, the certainty of another Boston Marathon taking place and Plaintiffs' guaranteed presence as spectators establish a real and significant threat of future discrimination, supported by documented past incidents and the BAA's endorsement of the NPD's unlawful conduct. Compl. ¶¶ 41 & 42; *see Connor B. ex rel. Vigurs*, 771 F. Supp. 2d at 153 ("they may fairly argue that they suffer ongoing harm resulting from the alleged systemic failures"); *Richard Roe W.M. v. Devereux Foun*d, 650 F. Supp. 3d 319, 329 (E.D. Pa. 2023) ("Whether framed as the ongoing harm …. or the likely future harm of continuing abuse because of these policies, this alleged injury satisfies the actuality or imminence requirement").

The BAA also cites *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023), which is similarly distinguishable from the current matter. BAA Brief at 19. In *Roe*, the First Circuit determined there was no risk of future harm to plaintiffs who had objected to remote instruction during the COVID-19 pandemic because the pandemic had ended, and in-person schooling had resumed. *Id.* It would be a far stretch to say that an injury, dependent on schools closing again due to a global pandemic, is similar to Plaintiffs' injury—namely, being racially profiled at the Boston Marathon. *Id.* Plaintiffs' injury does not require the reoccurrence of a catastrophic worldwide pandemic or other hypothetical sequence of events. *Id.* The Boston Marathon is guaranteed to happen every year— hand-in-glove with law enforcement—and Plaintiffs intend to be cheering spectators at future Marathons. Further, as the Complaint details, both the BAA's president and the Newton Police Chief have taken affirmative steps to demonstrate their approval of Defendants' conduct that is the subject of this Complaint. Compl. ¶ 42 (BAA president ratifying NPD's conduct); (Defendant

Carmichael stating he stands by NPD's response) *supra*. n.18. *See also N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426 (1941) (noting that a federal court has broad power to restrain acts similar to those it has found unlawful or that may reasonably be anticipated based on the defendant's past conduct).

The BAA also argues that Plaintiff's future-looking relief is inadequate because the BAA claims that it "actively engaged with TrailblazHers" after the 2023 Marathon and purportedly improved their practices. BAA Brief at 3 & 4, 6. This argument is flawed for two reasons. First, at this juncture, this assertion is not relevant, as it is not included in the Complaint. *See Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020) (courts may "consider (a) 'implications from documents' attached to or fairly 'incorporated into the complaint,' (b) 'facts' susceptible to 'judicial notice,' and (c) 'concessions' in [the] plaintiff's 'response to the motion to dismiss.').

Second, even if post-2023 Marathon events *were* appropriate to consider, and even if the BAA had enacted meaningful reforms to prevent racial profiling (both of which Plaintiffs dispute), courts have long held that the probative value of post-litigation conduct is minimal, as such actions say little about what defendants' conduct would look like when not under court scrutiny. *See Gonzales v. Police Dep't, City of San Jose, Cal.*, 901 F.2d 758, 761–62 (9th Cir. 1990) ("Looking at the [defendant's] record of performance after the courts have been asked to intervene is irrelevant to the merits of a discrimination claim and can be highly misleading."); *see also E.E.O.C. v. Astra U.S.A., Inc*., 94 F.3d 738, 745 (1st Cir. 1996) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit...."); *Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804, 806 (1st Cir. 1971); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 658 (4th Cir. 1967) ("Such a last-minute change of heart is suspect, to say the least.").

Although these will be matters for trial, for the 2024 Marathon, Plaintiffs themselves proactively implemented measures in an attempt to avoid police harassment and prevent a repeat of the 2023 Marathon's ordeal. The lack of meaningful action from Defendants to protect Plaintiffs and other spectators of color in future events underscores the need for relief. As the Supreme Court has held, "an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to return to [their] old ways." *A.Y. Allee v. Medrano*, 416 U.S. 802, 811 (1974) (internal quotations omitted). Here, Plaintiffs have presented substantial evidence of a likelihood of future harm.

The BAA also argues that Plaintiffs' injunctive relief is vague, broad and tantamount to an "obey-the-law" directive. BAA Brief at 20.  To begin with, the BAA's objections to the form of Plaintiffs' relief are woefully premature because Rule 12(b)(6) challenges the adequacy of the pleadings based on the claim under Rule 8(a)(2) and does not consider the demand for judgment under Rule 8(a)(3). *See LaBonte v. Riverside Park Enterprises, Inc*., No. 22-CV-30046, 2022 WL 17253663, at *5 (D. Mass. Nov. 28, 2022) ("A Rule 12(b)(6) analysis tests the plausibility of claims, and remedies are not claims."); *U.S. v. Sunsetter Products LP*, No. 23-CV-10744, 2024 WL 1116062, at *5 (D. Mass. Mar. 14, 2024).

Even if these objections were not premature—though they are— and even if interpreted as an obey-the-law directive, Plaintiffs have satisfied Rule 65's requirements. Courts have determined that the enforceability of such directives depends on the specific context. *Merriam v. Demoulas*, No. 11-CV-10577, 2013 WL 2422789, at *10 (D. Mass. June 3, 2013). Here, Plaintiffs seek to enjoin Defendants from racially profiling, discriminating against Plaintiffs, and depriving them of equal opportunity to participate as spectators of the Boston Marathon. Compl., Prayer for

33

Relief. This provides Defendants with sufficient notice and describes the enjoined acts in reasonable detail. *See United States v. Miller,* 588 F.2d 1256, 1261 (9th Cir. 1978) (upholding an "obey the law" injunction that mirrored statutory text because the "statutory terms adequately describe the impermissible conduct"); *E.E.O.C. v. AutoZone, Inc*., 707 F.3d 824, 844 (7th Cir. 2013) (affirming "obey-the-law injunction" in discrimination case). Given that Defendants are sophisticated parties who understand the prohibitions against racial discrimination and have access to legal counsel for guidance, the specificity of the Plaintiffs' injunction is sufficient. *See Sec. & Exch. Comm'n v. McLellan*, ___ F.Supp. 3d ___, 2024 WL 3030421, at *8 (D. Mass. June 17, 2024) (affirming an "obey-the-law" injunction where defendant was sophisticated and "expert enough in the field" to understand the acts enjoined).

Plaintiffs have adequately demonstrated a real and immediate threat of future harm and met the criteria for injunctive relief.[19]

## V.     **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motions to Dismiss in full.

Dated:  July 30, 2024                                   Respectfully submitted,

Mirian Albert, BBO #710093
Sophia Hall, BBO #684541
Oren Sellstrom (BBO # 569045)
Iván Espinoza-Madrigal (BBO # 708080)

---

[19] Should the Court find that Plaintiffs' allegations are insufficient as to this or any other arguments raised by Defendants, Plaintiffs request leave to amend the Complaint accordingly. Alternatively, this Court has the discretion to grant Plaintiffs "some latitude" to proceed with discovery when a plausible claim is suggested "based on what is known" and the critical information is primarily in the defendants' control. *Menard v. CSX Transp., Inc*., 698 F.3d 40, 45 (1st Cir. 2012) ("[T]he district court has discretion to allow limited discovery and, if justified, a final amendment of the complaint."); *Peñalbert–Rosa v. Fortuño–Burset*, 631 F.3d 592, 596–97 (1st Cir.2011).

LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
malbert@lawyersforcivilrights.org
shall@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
iespinoza@lawyersforcivilrights.org
*Attorneys for Plaintiffs*

## CERTIFICATE OF CONFERENCE

In accordance with Local Rule 7.1(a), I hereby certify that counsel for Plaintiffs conferred with counsel for Defendants via-email and attempted in good faith to resolve or narrow the issues set forth in this motion.

*/s/ Mirian Albert*

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the Court's ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on June 25, 2023.

*/s/ Mirian Albert*